# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BARRY JONES,

    Plaintiff,

       v.

BRENDA TRITT,
SUPERINTENDENT, *et al.*

    Defendants.

NO. 1:16-cv-1537

(JUDGE CAPUTO)

## MEMORANDUM

Presently before me is a Motion to Alter or Amend Judgment (Doc. 55) filed by Plaintiff Barry Jones ("Plaintiff" or "Mr. Jones") and a Motion for Summary Judgment filed by Defendant Haresh Pandya ("Defendant" or "Dr. Pandya") (Doc. 59). For the reasons below, both the Motion for Summary Judgment and the Motion to Alter or Amend Judgment will be denied.

## I. Motion to Alter or Amend Judgment

### A.    Background

On July 22, 2016, Plaintiff filed a Complaint under 42 U.S.C. § 1983 against two groups of defendants who are employed at Frackville State Correctional Institution ("SCI-Frackville"): (1) the Medical Defendants, comprised of Dr. Pandya, Nelson Iannuzzi, Certified Registered Nurse Practitioner ("CRNP"), and Dr. Harewood,[1] and (2) the Corrections Defendants, comprised of Superintendent Brenda Tritt, Captain Sean Downs, Vickie Stanishefski, Corrections Health Care Administrator ("CHCA"), and Daniel Zaremba, Registered Nurse. (*See* Doc. 1 *generally*). Plaintiff's Complaint raised the following claims: (1) deliberate indifference to a serious medical need in violation of the Eighth Amendment against the Medical Defendants, CHCA

---

[1]    Dr. Harewood was dismissed as a defendant on February 3, 2017 due to Plaintiff's failure to provide necessary information to effect service. (Doc. 39).

Stanishefki, and Nurse Zaremba; (2) interference with legal mail in violation of the First Amendment against Captain Downs; and (3) confiscation of $500 from Plaintiff's inmate account without a hearing in violation of Plaintiff's Fourteenth Amendment Due Process rights against Captain Downs and Superintendent Tritt. *Id.*

On November 7, 2016, the Medical Defendants filed a Motion to Dismiss the Complaint. (Doc. 25). Before the Court issued a decision on the Motion to Dismiss, the Correctional Defendants, on July 12, 2017, filed a Motion for Judgment on the Pleadings. (Doc. 44). On October 5, 2017, United States District Judge William W. Caldwell granted the Motion to Dismiss as to CRNP Iannuzzi, denied the Motion to Dismiss as to Dr. Pandya, and granted the Motion for Judgment on the Pleadings as to all of the Corrections Defendants. (Doc. 47, Doc. 48). Thus, the only surviving claim is the Eighth Amendment deliberate indifference claim against Dr. Pandya. Plaintiff subsequently filed the instant Motion to Alter or Amend the Judgment on November 1, 2017. (Doc. 55). This Matter was reassigned to me on February 5, 2018. Plaintiff's Motion to Alter or Amend Judgment is now ripe for review.

**B.     Legal Standard**

A motion for reconsideration is governed by Rule 59(e) of the Federal Rules of Civil Procedure, which allows a party to move to alter or amend a judgment within twenty-eight days of its entry. The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985). A judgment may be altered or amended if the party seeking reconsideration establishes at least one of the following grounds: "(1) an intervening change in controlling law; (2) the availability of new evidence that was not available when the court granted the motion []; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café, by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999). "A motion for reconsideration is not to be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and

2

the litigant." *Odgen v. Keystone Residence*, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002). "[R]econsideration motions may not be used to raise new arguments or present evidence that could have been raised prior to the entry of judgment." *Hill v. Tammac Corp.*, Civ. A. No. 05-1148, 2006 WL 529044, at *2 (M.D. Pa. Mar. 3, 2006). The reconsideration of a judgment is an extraordinary remedy, and such motions should be granted sparingly. *D'Angio v. Borough of Nescopeck*, 56 F. Supp. 2d 502, 504 (M.D. Pa. 1999).

## C. Discussion

The Corrections Defendants argue Plaintiff's Motion to Alter or Amend Judgment is actually a motion to reconsider under Local Rule 7.10 and is therefore untimely because it was not filed within fourteen (14) days of the court's entry of judgment. M.D. Pa. LR 7.10. The portion of Plaintiff's Motion which requests reconsideration of the entry of judgment on the pleadings, however, is a proper motion to alter or amend judgment under Rule 59(e) of the Federal Rules of Civil Procedure. *See Jang v. Boston Scientific Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013) (acknowledging the district court had discretion to determine whether to grant a Rule 59(e) motion to reconsider entry of judgment on the pleadings under Rule 12(c)); *Rankin v. Heckler*, 761 F.2d 936, 942 (3d Cir. 1985) (determining a motion filed within the time frame for entry of judgment provided in Rule 59(e) that questions "the correctness of a judgment may be treated as a motion to alter or amend the judgment under Rule 59(e)"); *Rouse v. Pa. Dep't of Corr.*, No. 3:13-cv-1808, 2017 WL 3141078 (M.D. Pa. July 24, 2017) (Mariani, J.). Because Plaintiff filed his Motion on November 1, 2017, which is within twenty-eight (28) days of the order dated October 5, 2017, Plaintiff's Motion as to the entry of judgment is timely.

Plaintiff also challenges the Court's dismissal of his claim against CRNP Iannuzzi. Because the Court's order on the Motion to Dismiss is not final given that the claim against Dr. Pandya remains, the portion of the Motion requesting reconsideration of the Motion to Dismiss is governed by Local Rule 7.10 and is

therefore untimely. *See* LR 7.10 ("Any motion for reconsideration or reargument must be accompanied by a supporting brief and filed within fourteen (14) days after the entry of the order concerned."); *Amos v. Franklin Fin. Servs. Corp.*, No. 1:CV-10-1285, 2011 WL 5903875, at *2 (M.D. Pa. Nov. 22, 2011) (Caldwell, J.) ("The May 26, 2011, order dismissing the action was final because it left nothing more to be done by this court."). I will nevertheless consider the merits of this portion of the Motion pursuant to Local Rule 1.3. *See* L.R. 1.3 (permitting a court to suspend the local rules in individual cases); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, No. 3:06-CV-1105, 2011 WL 4916397, at *3 (M.D. Pa. Oct. 17, 2011) (Conner, J.) (invoking Local Rule 1.3 to consider the merits of a potentially untimely motion under Rule 7.10).

### 1. Failure to Serve Brief in Support of Motion for Entry of Judgment on the Pleadings

Plaintiff argues the entry of judgment on the pleadings should be vacated because he claims he was never served a copy of Correctional Defendants' brief in support of their Motion for Entry of Judgment on the Pleadings. (Doc. 56 at 3). Rule 5(b) provides service of a paper, such as Correctional Defendants' brief, via mail to the person's last known address is "complete upon mailing[.]" Fed. R. Civ. P. 5(b)(2)(C). The certificate of service page of Correctional Defendants' brief in support of the 12(c) Motion reflects that service was made via U.S. mail to "Barry Jones, HF-5900, SCI Frackville, 1111 Altamount Boulevard, Frackville, PA 17931." (Doc. 46 at 29). This was Plaintiff's correct address when he filed his Complaint and remains such to this day. (*See* Doc. 58 at 5). Plaintiff appears to argue the Corrections Defendants mistakenly served him with pleadings for a different case, thinking they were serving him their brief in support of the Motion for Judgment on the Pleadings.[2] These

---

[2] Plaintiff claims he received a copy of a document entitled "Anthony Edward Oliver, KG-8495, No. 3:16-cv-00407, Answer and Affirmative Defence [*sic*] to Plaintiff's Amended Complaint." (Doc. 56 at 3). Plaintiff asserts this document was in an envelope addressed to him. *Id.*

pleadings, however, are signed by Samuel H. Foreman, counsel for the Medical Defendants, which shows that Correctional Defendants did not mistakenly serve the wrong document in lieu of their brief. (Doc. 56 at 11-15). Accordingly, the brief was properly served and Plaintiff's Motion to Alter or Amend Judgment may not be granted on this basis.

### 2. Merit-Based Challenges

Plaintiff challenges a number of factual and legal conclusions in the Court's October 5, 2017 Memorandum; however, none of these factual challenges present a clear error of fact warranting reconsideration.[3] Plaintiff also challenges the Court's legal conclusions as to the dismissal of his Eighth Amendment Claim against CRNP Iannuzzi, judgment against Plaintiff on his Eighth Amendment Claim against CHCA Stanishefsky, judgment against Plaintiff on his access to the courts claim against Captain Downs, and the Court's decision to deny Plaintiff leave to amend his Complaint as futile. As Plaintiff does not challenge the Court's decisions on his Eighth Amendment Claim against Nurse Zaramber or his Due Process Claims against Superintendent Tritt and Captain Downs, the Court's entry of judgment on these claims will not be disturbed.

### a. Eighth Amendment Claim Against CRNP Iannuzzi

---

[3] First, Plaintiff challenges the Court's factual statement that on November 28, 2007 "no substitute medication would be prescribed" for his sarcoidosis and that he would be kept on a regimen of Eucerin cream; however, the documents referenced by Plaintiff do not contradict this factual statement. (Doc. 47 at 5). Second, Plaintiff alleges a clear error of fact, claiming the Court concluded that products sold in the commissary have provided him relief in the past. The Court made no such factual determination, noting only that Plaintiff "took issue with CRNP Iannuzzi's comment . . . sarcastically saying he could purchase Eucerin-like products in the commissary." (Doc. 47 at 9). Third, Plaintiff claims "the court incorrectly states Plaintiff signed up for a sick call, when it was Mrs. Stanishefski ChCA instructing plaintiff to sign up for a sick call." (Doc. 57 at 5). These statements are not inconsistent, as they both show Plaintiff signed up for a sick call on September 17, 2014.

Plaintiff challenges the Court's conclusion that he failed to state an Eighth Amendment claim for deliberate indifference against CRNP Iannuzzi based on his conduct at the September 17, 2014 sick call. In particular, Plaintiff argues his claim is supported by CRNP Iannuzzi's "unprofessional and sarcastic" demeanor that day as well as CRNP Iannuzzi's decision that Plaintiff's medical history was irrelevant to his treatment, despite acknowledging that Plaintiff was diagnosed with sarcoidosis. (*See id.* at 5-6). Plaintiff also notes that on December 23, 2016, CRNP Iannuzzi ordered pictures to be taken of the granulomas that had spread to his upper body. He asserts this shows CRNP Iannuzzi was aware of the extent to which Plaintiff's sarcoidosis required treatment when he suggested Plaintiff purchase a Eucerin-like cream from the commissary at the September 17, 2014 sick call. However, CRNP Iannuzzi's decision to order photographs on December 23, 2016 does not show he was aware of the severity of Plaintiff's sarcoidosis more than two years earlier when he suggested the Eucerin-like product. Indeed, it appeared to CRNP Iannuzzi upon his "limited examination" on September 17, 2014 that Plaintiff only had "dry skin" and he nevertheless advised Plaintiff that "he could purchase other ointments in the commissary if he chose not to follow the prescribed treatment" of Vitamin E lotion. (Doc. 1 at 43; Doc. 46 at 19). Because Plaintiff's claim against CRNP Iannuzzi is based solely on the September 17, 2014 meeting, CRNP Iannuzzi's conduct that day does not amount to deliberate indifference.

### b. Eighth Amendment Claim Against CHCA Stanishefski

Plaintiff also challenges the Court's conclusion that he failed to state an Eighth Amendment claim for deliberate indifference against CHCA Stanishefki. Suggesting CHCA Stanishefski "personally directed" CRNP Iannuzzi and other medical staff members to deny Plaintiff his previously prescribed medication, Plaintiff attempts to attack the Court's legal conclusion that CHCA Stanishefski was not personally involved in the treatment of Plaintiff's sarcoidosis. (Doc. 57 at 5). While Plaintiff claims CHCA Stanishefski's personal involvement was "personally motivated by

vindictiveness and evil intent" against Plaintiff for filing grievances against her, and "her husband, Dr. Stanish/Stanishefski, Regional Medical Direct SCI Dallas[,]" nothing in the extensive documentation provided by the parties supports this allegation. Plaintiff is therefore unable to demonstrate CHCA Stanishefski's personal involvement in his sarcoidosis treatment and has therefore failed to show she acted with deliberate indifference in violation of the Eighth Amendment.

### 3. First Amendment Claim Against Captain Downs

Additionally, Plaintiff argues the Court erred by analyzing his interference with legal mail claim as an access to the courts claim.[4] The United States Court of Appeals for the Third Circuit has explained that prisoners "do not forfeit their First Amendment right to use of the mails" and that a "pattern and practice of opening properly marked incoming [legal] mail outside an inmate's presence infringes communication protected by the right to free speech." *Bieregu v. Reno*, 59 F.3d 1445, 1452 (3d Cir. 1995), *abrogated in part by Oliver v. Fauver*, 118 F.3d 175 (3d Cir. 1997); *see also Taylor v. Oney*, 196 F. App'x. 126, 128 (3d Cir. 2006) (reaffirming holding in *Bieregu* that "prison officials impinge upon the First Amendment rights of prisoners when they open prisoners' legal mail outside the presence of the addressee prisoner").

To state a First Amendment claim for opening a prisoner's mail, a plaintiff must allege that the interference with his legal mail was done according to a "pattern and practice." *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) ("A state pattern and

---

[4]    Plaintiff does not argue that the Court's legal conclusion as to his access to the courts claim is improper; he merely argues that the Court erred by failing to consider his other First Amendment claim based on the interference with his mail, specifically, opening his mail. I find the Court properly interpreted Plaintiff's claim against Captain Downs for the delay in sending his legal mail as an access to the courts claim and the entry of judgment on this claim therefore stands. *See,e.g. Brown v. Lowe*, No. 1:15-cv-02373, 2016 WL 444655, at *3-41 (M.D. Pa. June 22, 2016) (Mehalchick, M.J.) (construing plaintiff's failure to deliver mail claim as an access to the courts claim); *Bacon v. Carroll*, No. 05-714, 2009 WL 1662612, at *4 (D. Del. June 12, 2009) (Farnan, J.) (interpreting plaintiff's interference with mail claim as an access to the courts claim).

practice . . . of opening legal mail outside the presence of the addressee inmate . . . impinges upon the inmate's right to freedom of speech."). A prisoner may allege that actions were taken pursuant to a pattern or practice without the existence of a "blanket policy." *See, e.g. id* (distinguishing between "a pattern and practice" and an "explicit policy"). Prisoners need not allege or prove any "actual injury" beyond direct injury to their First Amendment right to use the mails. *Taylor*, 196 F. App'x at 128. Courts have found that mere isolated incidents outside of an inmate's presence, without evidence of an improper motive, are insufficient to establish a First Amendment violation. *See, e.g. Nixon v. Sec'y Pa. Dep't of Corr.*, 501 F. App'x 176, 178 (3d Cir. 2012) ("[T]he District Court correctly determined that Nixon's claim alleging a single, isolated interference with his personal mail was insufficient to constitute a first Amendment violation."); *Beese v. Liebe*, 51 F. App'x. 979, 981 (7th Cir. 2002) (dismissing First Amendment Claim based on allegations that four pieces of legal mail had been opened outside of inmate's presence, since the inmate presented no evidence that his legal mail had been intentionally opened, and where the inmate merely speculated that the prison official intended to do so); *Gardner v. Howard*, 109 F.3d 427, 420-31 (8th Cir. 1997) (isolated and inadvertent mishandling of legal mail not actionable); *Hale v. Pa Dep't of Corr.*, No. 3:07-cv-0345, 2010 WL 3791833, at *3 (M.D. Pa. Sept. 16, 2010) (Munley, J.) ("Isolated incidents of opening legal mail outside of an inmate's presence, without any evidence of improper motive, is nothing more than an assertion of negligence, and is insufficient to establish a constitutional violation.").

In his Complaint, Plaintiff alleges a piece of outgoing mail to his sister containing disbarment documents for his previous attorney was returned to him on January 22, 2015 "open and with a piece of tape" and did not contain the cash slip he initially sent with the mail. (Doc. 1 at 5, 14, 74). He was told his mail was returned because his inmate account did not contain sufficient funds. (*Id.* at 14). Plaintiff also alleges the mail that he sent on February 2, 2015 to the United States District Court for

the Eastern District of Philadelphia and the District Attorney was withheld by security, potentially "for investigative purposes" after his inmate account was frozen by Captain Downs, implying this mail may have been opened pursuant to this investigation. (*Id.* at 5, 14, 78). Given that Plaintiff has alleged only one instance in which his mail was actually opened, January 22, 2015, and has not even specifically alleged or provided documentation to show his February 2, 2015 mail was opened, his First Amendment claim does not present a pattern or practice of Captain Downs improperly handling his mail. *See Jefferson v. Doll*, No. 1:18-cv-01625, 2018 WL 4002966, at *5 (M.D. Pa. Aug. 22, 2018) (Rambo, J.) ("Because this isolated incident of opening Plaintiff's legal mail outside of his presence, without any evidence of improper motive, is simply insufficient to establish a constitutional violation, Plaintiff's complaint fails to state a claim upon which relief may be granted.").

### 4. Futility of Amendment

Courts are cautioned that because of the liberal pleading standard, a plaintiff should generally be granted leave to amend before dismissing a claim that is merely deficient. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). The federal rules allow for liberal amendments in light of the "principle that the purpose of pleading is to facilitate a proper decision on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962) (citations and internal quotations omitted). A court may deny a motion to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of the amendment." *Id*.

Plaintiff argues he should have been granted leave to amend his claims but does not propose any particular amendments to his claims. Instead, Plaintiff argues that the documentation that has already been submitted to the Court supports the allegations

in his Complaint.[5]  For the reasons discussed above, amendment would be futile on these claims given that the hundreds of pages of documentation—including prisoner grievances, responses, and appeals, medical records, photographs, and an affidavit—do not support the availability of a legal remedy for Plaintiff on these claims.

## II. Motion for Summary Judgment

### A.    Background

The facts presented in the summary judgment record, viewed in the light most favorable to Plaintiff, are as follows.  After being transferred to SCI Frackville, Mr. Jones began experiencing itchy skin around May of 1997.  (Doc. 61, "Def.'s SMF" ¶ 4; Doc. 74, "Pl.'s SMF, " ¶ 3).[6]

By July of 1998, Mr. Jones developed multiple lesions on his body and a pathology report taken around that time revealed "[a] proliferation of small capillaries in the papillary dermis associated with reactive hyperkeratosis."  (Doc. 71-2 at 48; Doc. 71 at 83).  Between March of 2002 and September of 2004, Mr. Jones developed rashes and hyperpigmented areas, his arms, back, and legs were "hypertrophic, dry, [and] scaley[,]" and he continued to have lesions on his skin.  (Doc. 71 at 61-62; Doc.

---

[5]    In his reply brief, Plaintiff asserts "strict proof will be proved" regarding Captain Downs's "practice of censoring out-going prisoners mail" on his First Amendment claim if his motion to reconsider is granted. (Doc. 58).  Apart from Plaintiff's legal inability to vicariously assert the rights of others who have had their outgoing mail "censored," further proof of the practice of censorship itself remains insufficient sufficient to show Plaintiff suffered actual legal harm.  *See Weaver v. Wilcox*, 650 F.2d 22, 27 (3d Cir. 1981) (inmates do not have standing to sue on behalf of fellow prisoners).

[6]    Local Rule 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  M.D. Pa. L.R. 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issue for trial.  *See id.*  Both parties filed Rule 56.1 statements.  (*See* Def's. SMF, *generally*; Pls.' SMF, *generally*).

71-1 at 11).

On August 30, 2007, Mr. Jones presented to the medical department with what he called an "out of control" rash on his abdomen, chest, and arms. (Doc. 71-1 at 14). In response, Dr. Scott Sterling suggested Mr. Jones be placed on the next telemedicine appointment with the dermatologist. (*Id.*). Dr. Stan Stanish also observed Mr. Jones's skin lesions on November 7, 2007 and requested they be biopsied. (Doc. 71 at 24). On November 21, 2007, Dr. J. Tan issued a dermapathology report finding Mr. Jones had a "[s]arcoidal [g]ranulomata" and "[d]iffuse nodular lesions across bass and abdomen / arms[.]" (Doc. 71 at 27). Shortly thereafter, on November 28, 2007, Dr. Sterling confirmed Mr. Jones's sarcoidosis diagnosis in his progress notes. (Def. Ex. A at 31). Mr. Jones continued to be observed by medical staff following this diagnosis; for instance, on June 21, 2013, Nancy Palmigiano, Physician Assistant-Certified ("PA-C"), observed Mr. Jones's "skin problems (severe) due to sarcoidosis." (Doc. 71 at 67).

In September and October of 1998, Mr. Jones was prescribed Benzoyl Peroxide Lotion 5% for his skin problems but his prescription was changed to Eucerin cream ("Eucerin") around September of 2001. (Doc. 71-2 at 49; Doc. 71 at 65). By late-2004, Mr. Jones was continuously prescribed Eucerin for his skin. (Doc. 71 at 35-40, 66, 93-100; Doc. 71-2 at 1-2, 4-5).[7] However, in July of 2013, Mr. Jones's Eucerin prescription was discontinued.[8] (Def.'s SMF, ¶ 23; Pl.'s SMF, ¶ 20). In lieu of Eucerin, Dr. Sterling and PA-C Palmigiano prescribed Mr. Jones Vitamin E lotion. (Doc. 71 at 31).

---

[7]  The parties agree that in December of 2008, Mr. Jones reported Eucerin was effective in treating his skin condition. (Def.'s SMF, ¶ 18; Pl.'s SMF, ¶ 15).

[8]  The documentation offered by both parties reflects Wexford, DOC's then-private health care contractor, decided to discontinue the Eucerin prescription. While no reason for this decision is made clear, PA-C Palmigiano, noted in Mr. Jones's chart on September 17, 2013 that Eucerin was designated as non-formulary and Mr. Jones's prescription was then denied. (Doc. 71-2 at 14)

Mr. Jones informed PA-C Palmigiano that the Vitamin E lotion was "useless" and "makes [him] itch."[9] (Doc. 71-2 at 14). He was then prescribed Lubriskin ("Lubriderm") as a substitute. (Doc. 71 at 31). Roughly one month later, on October 4, 2013, Mr. Jones presented to the medical department with his "back, trunk, and diffuse areas covered in acne-like lesions." (Doc. 71-1 at 15). Mr. Jones informed Dr. Sterling that he was no longer using the Lubriderm because it made him "sweat" and "itch." (*Id.*). In response, Dr. Sterling switched the prescription to Aquaphor. (Doc. 71 at 60). Throughout this time, Mr. Jones repeatedly requested that his Eucerin prescription be reinstated. (*See, e.g.* Doc. 71-1 at 16; Doc. 71-2 at 14).

By September of 2014, Defendant, Dr. Haresh Pandya, was working at SCI-Frackville.[10] Mr. Jones saw Dr. Pandya on September 4, 2014, presenting with "lesions, [and] thickened skin[,]" *inter alia*, and reported that he was previously diagnosed with sarcoidosis. (Doc. 71 at 32). Dr. Pandya prescribed Mr. Jones Vitamin E lotion and noted in his progress notes that he would "review old chart for effect[.]" (*Id.*). On September 11, 2014, Mr. Jones informed Dr. Pandya that the Vitamin E lotion was not working and that Eucerin was the only remedy that worked for him in the past. (Def.'s SMF, ¶ 32; Pl.'s SMF ¶¶ 27, 29). Mr. Jones visited CRNP Iannuzzi on September 17, 2014, who noted "sarcoidosis offered by inmate, but asymptomatic" and referred Mr. Jones to the commissary, where he could purchase lotion for his dry skin. (Doc. 71 at 33).

On October 3, 2014, Mr. Jones informed Dr. Pandya that he would no longer continue using the Vitamin E lotion because "it just makes [him] itch." (Doc. 71 at 34). Dr. Pandya observed that Mr. Jones's skin was dry and prescribed him a small

---

[9]     Interestingly, Mr. Jones filed a grievance on July 23, 2014 alleging Dr. Harewood acted with deliberate indifference when his "vital" medications, including Amlactin and Vitamin E were not renewed. (Def. Ex. B at 22).

[10]    The documentation reflects Dr. Pandya is currently serving as the facility's Medical Director, but it is unclear when he assumed this position.

amount of Cetaphil lotion ("Cetaphil") in addition to the Vitamin E lotion. (*Id.*; Doc. 71 at 43-44). Mr. Jones expressed to Dr. Pandya six (6) days later that his skin was worse even though he "covered [him]self" with the prescription. (Doc. 71 at 34). Dr. Pandya, however, observed Mr. Jones's "skin is actually better . . . raised lesions are gone . . . has several blackheads and hyperpigmented skin not raised[,]" was less dry, and instructed Jones to use the Cetaphil "very very sparingly." (*Id.*; Def.'s SMF, ¶ 39; Pl.'s SMF, ¶ 35). When Dr. Pandya saw Mr. Jones again on October 29, 2014, he observed his skin was very dry and wrote an order increasing the amount of Cetaphil.[11] (Def.'s SMF, ¶ 41; Pl.'s SMF, ¶ 37).

On January 9, 2015, Mr. Jones saw CRNP Iannuzzi about a rash on his skin and was prescribed additional topical treatment to the Vitamin E lotion. (Def.'s SMF, ¶ 46; Pl. 41). Three days later, Dr. Pandya observed Mr. Jones with a "heavy eczematosis rash[,]" "graftae lesions all over[,]" and "very dark skin[,]" and recommended no changes to Mr. Jones's treatment. (Def. Ex. A at 9; Def.'s SMF, ¶ 47; Pl.'s SMF, ¶ 42). When Dr. Pandya examined Mr. Jones's skin again on August 28, 2015, he noted many dark spots on his arm(s) and abdomen and planned to check Mr. Jones's charts for a biopsy report. (Def.'s SMF, at ¶ 53; Pl.'s SMF, at ¶ 48). The next time Dr. Pandya saw Mr. Jones, December 10, 2015, he recorded "skin sarcoidosis, improved" in Mr. Jones's chart. (Def. Ex. A at 2).

By October 9, 2016, Mr. Jones's Vitamin E lotion, prescribed by Dr. Pandya on April 13, 2016 for a six (6) month supply, had lapsed and no subsequent prescription appears to have been ordered. (Def. Ex. A at 106; Doc. 71 at 52). During a sick call on October 20, 2016, CRNP Iannuzzi observed Mr. Jones's skin to be "hyperpigment[ed][,]" "flaking silvery sandpaperlike" and told Mr. Jones he should not

---

[11]     Mr. Jones's Cetaphil prescription was discontinued in January of 2015 and does not appear to have been renewed. (Def. Ex. A at 122). I also note Mr. Jones was still prescribed Vitamin E lotion along with the Cetaphil at this time. (Doc. 71 at 43).

use Vitamin E lotion. (Def. Ex. A at 53; Def.'s SMF, ¶ 57; Pl.'s SMF, at ¶ 52). Between October 23 and 25, 2016, Mr. Jones refused CRNP Iannuzzi's proposed topical treatments for his skin condition. (Def.'s SMF, ¶¶ 60, 61; Pl.'s SMF, ¶¶ 54, 55; Def. Ex. A at 54). On November 9, 2016, a skin punch biopsy was conducted and revealed "changes consistent with Lichen simplex chronica / prurigo nodularis." (Def. Ex. A at 44). While Mr. Jones continued to see the medical staff for his other health problems, his medical records do not indicate Mr. Jones's skin condition was further observed or treated between December of 2016 and late-2017.

As documented by his December 20, 2017 commissary receipt, Mr. Jones began purchasing lotion from the commissary at some point. (Doc. 7102 at 41, 43). On December 28, 2017, Dr. Pandya examined Mr. Jones's skin and diagnosed him with lichen simplex and nodularis. (Def. Ex. A at 58). Mr. Jones saw Dr. Pandya again on February 9, 2018 about his continued itchiness. (Def. Ex. A at 57). Despite his previous diagnosis, Dr. Pandya decided to schedule a dermatology consult. (*Id.*). On February 26, 2018, Mr. Jones had a telemedicine appoint with dermatologist Dr. Schliescher, who diagnosed him with eczematis dermatitis and suggested a treatment plan of Eucerin moving forward, "given patient's prior favorable response." (Doc. 71-2 at 6; Def. Ex. A at 38). Specifically, Dr. Schliescher recommended Mr. Jones apply Eucerin "twice a day to affected area[.]" (Def. Ex. A at 56). From February 28, 2018 onward, Dr. Pandya prescribed Mr. Jones Eucerin. (Def. Ex. A at 115, 117-18, 120).[12]

As discussed above, Plaintiff filed a Complaint under 42 U.S.C. § 1983 against two groups of defendants who are employed at Frackville State Correctional Institution alleging a number of constitutional violations. Following United States District Judge William W. Caldwell's October 5, 2017 Memorandum and Order, the only surviving

---

[12] Mr. Jones filed a number of grievances about the medical staff's response to his skin condition throughout his time at SCI Frackville. These grievances were denied. (Doc. 71 at 3, 56; Doc. 71-1 at 18, 81, 90; Doc.71-2 at 17, 28; Def. Ex. B at 24-33, 35-44, 54-62).

claim is against Dr. Pandya for deliberate indifference to a serious medical need in violation of the Eighth Amendment. On May 17, 2018, Dr. Pandya filed the instant Motion for Summary Judgment. (Doc. 59). The Motion for Summary Judgment is now ripe for review.

## B. Legal Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. *See Edelman v. Comm'r of Soc. Sec.*, 83 F.3d 68, 70 (3d Cir. 1996). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 251 (3d Cir. 2010). The moving party may present its own evidence or, where the non-moving party has the burden of proof, simply point out to the court that "the non-moving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## C. Discussion

Defendant argues he is entitled to summary judgment because Plaintiff merely disagrees with Defendant's prescribed course of treatment and therefore no reasonable juror could find Defendant was deliberately indifferent toward Plaintiff's medical condition. (*See* Doc. 60, *generally*). Plaintiff maintains that the documentation supports a finding that Defendant provided inadequate medical care with deliberate indifference in violation of his Eighth Amendment constitutional rights. (*See* Doc. 72, *generally*).

The Eighth Amendment "requires prison officials to provide basic medical treatment" for those "incarcerated." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976)).  To establish an Eighth Amendment claim based on inadequate medical care, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003); *see also Rouse*, 182 F.3d at 197.

### 1.    Serious Medical Need

At the outset, Defendant has not challenged Plaintiff's assertion that his skin condition constitutes a serious medical need.  "A medical need is 'serious,' in satisfaction of the second prong of the *Estelle* test, if it is 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

The record shows Plaintiff's skin condition was repeatedly diagnosed and treated by several doctors and other medical professionals over the past twenty (20) years but is unclear as to the ultimate diagnosis.  Initially, the dermapatholoy report from July 14, 1998 found a "capillary hemangioma with reactive hyperkeratosis."  (Doc. 71 at 83).  Then, in 2007, the dermapathology report from Plaintiff's biopsy found a "Sarcoidal Granulomata" and Dr. Sterling recorded in his progress notes that Plaintiff was diagnosed with sarcoidosis.[13]  (Doc. 71 at 26, 28; Def. Ex. A at 31).  Dr. Pandya's notes in Mr. Jones's chart suggests he questioned the sarcoidosis diagnosis as early as

---

[13]    A  number of courts have determined sarcoidosis constitutes a serious medical need. *E.g.*, *Jackson v. Ivens*, 565 F. App'x 115, 118 (3d Cir. 2014) (noting the parties did not dispute that sarcoidosis is a "serious medical issue"); *Scott v. Clarke*, 64 F. Supp. 3d 813, 824 (W.D. Va. 2014) (concluding plaintiffs' diagnosed illnesses, including sarcoidosis, constitute "serious medical needs"); *Boston v. Garcia*, No. CIV S-10-1782, 2013 WL 3367577, at *8 n.1 (E.D. Cal. July 5, 2013) ("[A] reasonable juror could conclude that plaintiff's Sarcoidosis constitutes an objective, serious medical need.").

his first encounter with Mr. Jones. (*E.g.*, Doc. 71 at 32 ("9-4-14 . . . Sarcoidosis per pt."); *but see* Def. Ex. A at 2 (recording "skin - sarcoidosis, improved" on December 10, 2015)). Mr. Jones's skin punch biopsy reflected a diagnosis of "Lichen simplex chronica / prurigo nodularis" in November of 2016. (Def. Ex. A at 44, 58 (determining "Lichen planus & Nodularis" on December 28, 2017)). At one point in February of 2018, Dr. Pandya concluded Mr. Jones's itchiness related to "his Cirrhosis." (*Id.* at 57). Additionally, Dr. Schliescher diagnosed Mr. Jones's condition as "eczematis dermatitis" on February 26, 2018.[14] (*Id.* at 38; Doc. 71-2 at 6). Interestingly, in his referral notes for Mr. Jones's neurology telemedicine appointment with Dr. Kelly Ahn dated June 2, 2018, Dr. Pandya listed "cirrhosis[,]" "sarcoidosis of skin[,]" and "eczema, atopic dermatits" under "*Present* Illness Injury and Phusical Findings." (Doc. 71 at 85) (emphasis added). However, in his referral notes dated April 13, 2018 for Mr. Jones's infectious disease telemedicine appointment, Dr. Pandya listed only "eczema, atopic dermatitis" under "Significant *Past* Medical & Surgical History" and did not mention sarcoidosis anywhere. (*Id.* at 84) (emphasis added). Relatedly, in his referral notes dated February 16, 2018 for Mr. Jones's dermatology telemedicine appointment with Dr. Schliescher, Dr. Pandya listed "sarcoidosis of skin" under "Significant *Past* Medical and Surgical History" and "eczema, atopic dermatitis" under "*Present* Illness and Injury Physical Findings." (*Id.* at 63).

Additionally, the photographs dated October 23, 2016, December 28, 2017, and April 9, 2018, despite their poor image quality, unequivocally depict raised skin bumps, lesions, and skin discoloration on Plaintiff's legs, chest, back, and arms. (Doc. 71 at 8, 10-12, 16-17, 20). The obviousness of Plaintiff's skin condition, as shown

---

[14] "The Third Circuit said that eczema can be a serious medical condition when the skin is so cracked and dry that it bleeds." *McKeithan v. Iannuzzi*, No. 1:10-cv-1751, 2011 WL 6782305, at *6 (M.D. Pa. Dec. 21, 2011). In his October 21, 2014 grievance, Plaintiff describes his skin condition as follows: "my entire body is affected with bumps, open bleeding legions [*sic*], scared inflamed dead tissue." (Def. Ex. B at 62).

through these photos and statements by Plaintiff's fellow inmates, would lead a lay person to recognize that a doctor's attention is needed. (Doc. 40-5 at 33-41). Accordingly, I find Plaintiff's skin condition constitutes a serious medical need.

## 2. Deliberate Indifference

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104, 97 S.Ct. at 291. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990). The deliberate indifference prong of an adequacy of care claim in particular contains both an objective component, the "adequacy of the medical care[,]" and a subjective component, the "individual defendant's state of mind." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 536 (3d Cir. 2017).

As previously noted, Plaintiff asserts three bases for finding Defendant was deliberately indifferent to his serious medical need: (1) by implementing a "less efficacious medication regimen[;]" (2) by delaying necessary medical treatment for non-medical reasons; and (3) by preventing Plaintiff from receiving the recommended medical treatment for sarcoidosis. (Doc. 72 at 1). Plaintiff argues Defendant's deliberate indifference subjected him to wanton and unnecessary pain, suffering, and allowed Plaintiff's skin condition to worsen. (*Id.*).

### a. Delaying Necessary Medical Treatment and Preventing Plaintiff from Receiving Recommended Treatment

The record does not support a finding of deliberate indifference on either of these bases. First, while the documentation reflects Plaintiff's clear preference for Eucerin, Plaintiff has not proven Eucerin is "necessary" to treat the symptoms of any of the conditions with which Plaintiff has been diagnosed. Indeed, Plaintiff even

19

admits that the lotion he has purchased from commissary "temporarily relieves itching after the hard water shower plaintiff takes." (Pl.'s SMF, ¶ 63). Moreover, though Plaintiff disputes Defendant's assertion that the Vitamin E lotion and other creams prescribed were effective, the very existence of this factual dispute undermines Plaintiff's contention that Eucerin is necessary. The record therefore does not support Plaintiff's contention that Defendant was deliberately indifferent by delaying necessary medical treatment.

Second, the record does not support Plaintiff's contention that Defendant prevented him from receiving the physician-recommended treatment of Eucerin. In *White*, the Third Circuit determined a physician's failure to order a previous prescription labeled "no substitution" may constitute deliberate indifference. 897 F.3d at 111. While Dr. Sterling previously ordered Eucerin, specifying "brand only" and "brand necessary[,]" Dr. Sterling was not a skin specialist, as was the case in *White*. *Id.* at 108. (Doc. 71 at 37-42). Unlike the specialist in *White*, the record does not show Dr. Sterling ever attempted to reach out to Wexford or any other treating physicians to explain why Eucerin was necessary. *White*, 897 F.3d at 108. Instead, Dr. Sterling merely prescribed alternative treatments including Vitamin E lotion, Benzoyl Peroxide Gel, and Aquaphor. (Doc. 71 at 31, 60). Indeed, Dr. Schliescher's suggested plan of Eucerin moving forward "given patient's prior favorable response" on February 26, 2018 is the only time a physician *recommended* Eucerin as a course of treatment. (Doc. 71-2 at 6; Def. Ex. A at 38). Two days later, on February 28, 2018, Defendant prescribed Plaintiff Eucerin and has continued to do so. (Def. Ex. A at 113-20). The documentation therefore does not support Plaintiff's contention that Defendant was deliberately indifferent on this basis.

### b.    Implementing a Less Efficacious Medication Regimen

"[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson v.*

*Prison Health Serv.*, 850 F.3d 526, 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)). Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Goodwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

"Nonetheless, there are circumstances in which some care is provided yet is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017) (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Notably, the Third Circuit has found that "persistent conduct in the face of resultant pain and risk of permanent injury[,]" such as "insist[ing] on continuing courses of treatment that the doctor knew were painful, ineffective or entailed substantial risk of serious harm to the prisoner[]" constitutes deliberate indifference. *White v. Napoleon*, 897 F.3d at 109; *see also Pearson*, 850 F.3d at 541.

### i. Objective Inquiry - Adequate Medical Care

A plaintiff must provide extrinsic evidence to establish deliberate indifference in an adequacy of care claim "where it would not be obvious to a layperson that the defendant breached a professional standard of care." *Pearson*, 850 F.3d at 536. Here, Plaintiff has provided extrinsic evidence in the form of photographs and medical records from which a reasonable jury could find Defendant's treatment fell below a professional standard of care. For instance, on October 3, 2014, Dr. Pandya noted Mr. Jones's skin was dry in his chart and prescribed Cetaphil in addition to the Vitamin E

lotion. (Doc. 71 at 34). Less than one week later, on October 9, 2014, Dr. Pandya saw Mr. Jones again, who complained his skin was worse than before, despite covering himself with the Cetaphil. (*Id.*). In his progress note for this visit, Dr. Pandya recorded Mr. Jones "has several blackheads and hyperpigmented skin not raised[,]" concluding Mr. Jones's "skin is actually better . . . raised lesions are gone" even though his prior note made no mention of lesions, and recommended Mr. Jones use Cetaphil only "very very sparingly." (*Id.*). Dr. Pandya opted not to change Mr. Jones's prescription even after he presented with a "heavy eczematosis rash[,]" "graftae lesions all over[,]" and "very dark skin" on January 12, 2015. (Def. Ex. A at 9; Def.'s SMF, ¶ 47; Pl.'s SMF, ¶ 42).

Mr. Jones's medical records from October 2016 also reflect that his skin condition had significantly deteriorated from December of 2015, when Dr. Pandya concluded Mr. Jones's "skin sarcoidosis" was "improved." (Def. Ex. A at 2). During a sick call on October 20, 2016, CRNP Iannuzzi described Mr. Jones's skin as "hyperpigment[ed][,]" "flaking silvery sandpaperlike" and photos taken on October 23, 2016 reveal many raised, darkened bumps that appear to be lesions on Mr. Jones's chest and arms." Further, the parties do not dispute that CRNP Iannuzzi instructed Mr. Jones to discontinue his use of Vitamin E lotion, and the medical records confirm that his Vitamin E prescription, which was consistently prescribed by Dr. Pandya beginning in September of 2014, was finally discontinued at this time. (Def.'s SMF, ¶ 57; Pl.'s SMF, ¶ 52; Def. Ex. A at 53; Doc. 71 at 46, 49, 50, 52). This extrinsic evidence is sufficient "to create a triable issue" on the adequacy of Dr. Pandya's care. *Pearson*, 850 F.3d at 536.

ii. **Subjective Inquiry - Individual Defendant's State of Mind**

The medical records reflect Dr. Pandya was aware of the condition of Plaintiff's

skin—including lesions, rashes and hyperpigmentation—while he was prescribing Vitamin E lotion and other topical treatments. Dr. Pandya also knew that Mr. Jones was bothered by the condition of his skin and that the Vitamin E lotion made Mr. Jones itchy, yet he continued to prescribe this treatment. (*See, e.g.*, Doc. 71 at 34).

Based on the legal presumption of adequate care, a reasonable jury could conclude Dr. Pandya was motivated by medical reasons in repeatedly deciding to prescribe Vitamin E lotion and not Eucerin.[15] However, a reasonable jury could conclude, in light of Dr. Pandya's incomplete chart entries, Dr. Pandya's Eucerin prescriptions following the dermatology consultation in February of 2018, and most importantly, PA-C Palmigiano's notes explaining that Eucerin was no longer approved and was a non-formulary, that Dr. Pandya's treatment decisions were motivated by non-medical factors. *Durmer*, 99 F.2d at 69. Because Dr. Pandya offers only his notes in Mr. Jones's medical records to explain his motivations, it is "important that the trier of fact hear [Dr. Pandya's] testimony in order to assess his credibility, and that [Mr. Jones] be permitted to explore the doctor's motivation on cross examination." *Id.* at 69.

One reasonable reading of the record is that Dr. Pandya assessed Mr. Jones's skin each time he came in with a complaint, used his medical judgment to alter the prescribed course of treatment as needed, and that any worsening of Mr. Jones's skin that occurred is due to his refusal to use the Vitamin E lotion and other creams as prescribed. However, this is not the only reasonable reading of the record. *See id.* at 67 ("While this may be one reasonable reading of the record, we cannot conclude that it is the only reasonable reading of the record."). Another reasonable reading of the

---

[15]     Defendant concludes the record demonstrates the Vitamin E lotion was effective in treating Plaintiff's skin condition. However, because this appears in the record merely as conclusory statement in Mr. Jones's medical records and is not supported by any explanations or data, I will decline drawing a conclusion as to the efficacy of the Vitamin E lotion.

record is that Dr. Pandya, aware of the additional itching caused by the Vitamin E lotion, continued outbreaks of Mr. Jones's skin condition, documented efficacy of Eucerin in Mr. Jones's chart, and Mr. Jones's preference for Eucerin, nevertheless repeatedly declined to prescribe Eucerin in favor of continuing the Vitamin E lotion for non-medical reasons. "[W]hen deciding a motion for summary judgment, 'the evidence of the non-movant is to be believed,' and credibility determinations must be left to the jury." *Pearson*, 850 F.3d at 541 n.5 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct 2505 (1986)).

For these reasons, I will deny Defendant's Motion for Summary Judgment.

### IV. Conclusion

For the above stated reasons, both the Motion to Alter or Amend Judgment (Doc. 55) and the Motion for Summary Judgment (Doc. 59) will be **DENIED**.

An appropriate order follows.


 February 20, 2019                                                  /s/ A. Richard Caputo
Date                                                                       A. Richard Caputo
                                                                             United States District Judge

24